# UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

Billy Cepero,

     Plaintiff

v.

Douglas Gillespie et al.,

     Defendants

Case No.: 2:11-cv-01421-JAD-NJK

**Order Granting in Part Defendants'
Motion for Summary Judgment and
Directing Plaintiff to Show Cause Why
Claims Against Defendants Fowler and
Aiken Should Not Be Dismissed
for Lack of Service**

[ECF No. 159]

An appeal and a decade have passed since plaintiff Billy Cepero was allegedly assaulted by Las Vegas Metropolitan Police Department (LVMPD) officers during his arrest, which traversed two apartment units connected by a hole in the wall, walls, fences, and a ditch, and ended with Cepero barricading himself inside a bathroom.[1]  He sues the LVMPD, its spokesperson, twenty of its officers, and the former sheriff under 42 U.S.C. § 1983 and various state laws for injures he allegedly sustained during the melee.[2]  The defendants now move for summary judgment on all claims.[3]  Cepero maintains that genuine issues of disputed facts preclude summary judgment on any claim, and both sides also object to the evidence that each offers for me to consider in resolving this motion.

I overrule the parties' evidentiary objections because they rely on an outdated summary-judgment standard, but I decline to review one report that Cepero submits because it is not

---

[1] ECF No. 125 (complaint).

[2] *Id.*

[3] ECF No. 159 (motion for summary judgment).

admissible.  I grant the defendants' summary-judgment motion as to all claims and defendants

except James Bonkavich because competing versions of the key events leave me with factual

disputes that can't be summarily resolved.  I order Cepero to show cause by October 30, 2020,

why his claims against unserved defendants Aiken and Fowler should not be dismissed under

FRCP 4(m).  And I order the remaining parties to a mandatory settlement conference with the

magistrate judge.

**Background**

**I.      Factual background**

The parties dispute what happened that August 2009 morning when Cepero was allegedly

injured by the police.  One version of the story ends in a tussle between a violent Cepero and

officers; the other ends with the beating of an unconscious Cepero.  But both versions begin at

the Americana Suites where officers sought to arrest Cepero on outstanding warrants.

As Cepero acknowledges, once he recognized that the police might be coming for him, he

went into "fle[e] mode,"[4] burrowing his way through a hole in his closet wall into the

neighboring unit and exiting through his neighbor's door.[5]  Cepero then encountered Officer

Richard Hart, who recognized that he was attempting to run away.[6]  Hart fired his taser at

Cepero but did not make contact, and Cepero escaped—jumping over a wall, climbing two

fences, and running through a ditch.[7]  After trying and failing to borrow clothes from a neighbor

---

[4] Ex. Z at 101 ¶¶ 2–13 (Cepero deposition).

[5] Whether a Cepero-sized hole existed in the wall when he arrived or whether he made the hole to escape is both unknown and immaterial.

[6] Ex. Q at 90 (Hart's use-of-force report); Ex. Z at 119 ¶¶ 21–25, 120 ¶¶ 1–19.

[7] Ex. Q at 90; Ex. Z at 120 ¶¶ 4–15, 122 ¶¶ 1–8.

to alter his appearance,[8] Cepero hid inside the empty apartment of an acquaintance on Naples street.[9]  Meanwhile, the officers tried to figure out where Cepero had gone.  They spoke with the neighbor who had rebuffed Cepero and, after being pointed in the right direction, spotted him entering the Naples apartment.[10]

Attempts at getting Cepero to surrender—which included the officers and Cepero volleying gas canisters back and forth—were unsuccessful.[11]  By this point, Cepero had attempted to barricade himself in the bathroom.[12]  And after the failed attempts with the gas cannisters, the officers sent in a K9 to distract Cepero so they could arrest him.[13]  The parties disagree about what happened next.

### A.    Cepero's version of what happened next

According to Cepero, once he got into the bathroom, he stripped to his underwear so that the officers would know that he was not armed.[14]  He then laid down on his stomach with his hands on top of his head.[15]  While he was on the ground, the officers broke down the door and both the K9 and the broken door came crashing on top of him.[16]  Afraid that the officers had commanded the K9 to bite him, he wiggled out from underneath the door and grabbed the dog's

---

[8] Ex. CC at 10 ¶¶ 7–21 (Kenneth Pace deposition).

[9] Ex. Z at 122 ¶¶ 14–20.

[10] Ex. CC at 19 ¶¶ 8–25.

[11] *See* Ex. X at 20 ¶¶ 7–15 (Bonkavich deposition); Ex. Z at 124 ¶¶ 22–24, 125 ¶¶ 1–5, 10–24; Ex. Y at 32 ¶¶ 10–13 (Marx deposition); Ex. Z at 129 ¶¶ 18–22.

[12] Ex. Z at 130 ¶¶ 1–3.

[13] Ex. X at 33 ¶¶ 8–17.

[14] Ex. Z at 135 ¶¶ 7–16.

[15] *Id.* at 132 ¶¶ 1–2.

[16] *Id.* at ¶¶ 14–25, 133 ¶¶ 1–8.

neck and collar trying to settle the dog.[17]  An officer grabbed the dog and then something struck Cepero in the head, rendering him unconscious.[18]  Cepero maintains that, before that moment, he had no injuries.[19]  When Cepero came to, blood was gushing from his face and the officers were carrying him "like Superman," throwing water on him to rinse the blood off him.[20]

### B.    The officers' version

The officers tell a different story.  Because their other methods of getting Cepero—an ex-felon with a long and rich history of violent police encounters—to leave the apartment had failed, they decided to enter the apartment to physically retrieve him.  Officers James Bonkavich, Mark Fowler, William Marx, and a K9 officer entered the unit.  But Marx left without interacting with Cepero and before they could reach the bathroom door.[21]  Once the bathroom door was knocked down, the dog ran toward Cepero.  Cepero intercepted the dog and began choking it.[22] Fearing that Cepero would kill the dog, the officers removed the dog, and Bonkavich tried to taser Cepero.[23]  But yet again, the taser failed to strike him, so Bonkavich used "open hands" on Cepero.[24]

---

[17] *Id.* at 134 ¶¶ 2–8; 136 ¶¶1–6.

[18] *Id.* at 136 ¶¶ 12–14.

[19] *Id.* at 138 ¶¶ 2–10; 139 ¶¶ 13–23.

[20] *Id.* at 136 ¶¶ 14–16; 138 ¶¶ 17–18.

[21] Ex. Y at 28 ¶¶ 15–24; 29 ¶¶ 3–13.

[22] Ex. X at 33 ¶¶ 21–24.

[23] *Id.* at ¶¶ 13–17; 29 ¶¶ 14–15.

[24] *Id.* at 27 ¶¶ 13–17; 34 ¶¶ 7–9.

Bonkavich grabbed Cepero, but Cepero resisted and the two began to wrestle.[25]  As they fell into the small bathroom, Bonkavich feared that Cepero could still access his weapon.[26]  With his back to the wall, Bonkavich punched Cepero in the face multiple times.[27]  His strikes were effective, and together with Fowler, Bonkavich was able to subdue and arrest Cepero.[28]  Fowler took Cepero out of the bathroom, while Bonkavich stayed behind.[29]

**II.    Procedural history**

Two years later, Cepero (acting in a pro se capacity) filed this action.  It was originally dismissed as untimely[30] but revived when the Ninth Circuit reversed that dismissal on appeal.[31] After several rounds of screening, amendment, and the appointment of pro bono counsel,[32] this nine-year-old case finally finds its way to the summary-judgment stage on five claims against LVMPD and twenty-one officers: (1) excessive force, (2) assault and battery, (3) intentional infliction of emotional distress, (4) negligence, and (5) *Monell* liability under 42 U.S.C. § 1983.[33] The defendants now move for summary judgment on all of Cepero's claims, based on a cavalcade of arguments.  And both sides object to evidence submitted in support of the opposing party's briefing.  I consider each argument below.

---

[25] *Id.* at 37–40.

[26] *Id.* at 39 ¶¶ 2–15.

[27] *Id.* at 38 ¶¶ 18–21.

[28] *Id.* at 38 ¶¶ 19–24; 41 ¶¶ 19–25.

[29] *Id.* at 42 ¶¶ 1–8.

[30] ECF No. 65.

[31] ECF No. 84.

[32] *See* ECF No. 5 (application to proceed in forma pauperis and first complaint); ECF No. 9 at 10 (first screening order); ECF No. 28 (second screening order); ECF No. 111 (motion for leave to amend).

[33] ECF No. 125 (counseled amended complaint).

**Discussion**

**I.    The parties rely on an outdated standard for their evidentiary objections.**

Both parties object to the evidence presented for my review to resolve this motion. Cepero objects to the defendants' use of his prior convictions, arrest reports, warrant request, and other officer reports.[34]  The defendants generally object to all evidence Cepero cites because he failed to authenticate it.[35]  But neither party considers the proper standard following Rule 56's 2010 overhaul.  The 2010 amendment "eliminate[d] the unequivocal requirement that evidence submitted at summary judgment must be authenticated."[36]  Instead, the rule now mandates only that the substance of the proffered evidence be admissible at trial, regardless of its form on summary judgment.[37]  Thus, I overrule the defendants' objection on this basis.

Of the documents Cepero objects to, only Hart's use-of-force report is relevant to my analysis.[38]  Cepero argues generally that the reports contain inadmissible hearsay statements.[39] But while the report may be inadmissible in its current format, its contents are admissible, so I overrule Cepero's objection to Hart's use-of-force report.

**II.   Legal standard**

Summary judgment is appropriate when the pleadings and admissible evidence "show there is no genuine issue as to any material fact and that the movant is entitled to judgment as a

---

[34] ECF No. 167 at 44–51.

[35] ECF No. 175 at 12–13.

[36] *Romero v. Nev. Dep't of Corr.*, 673 F. App'x 641, 644 (9th Cir. 2016) (unpublished).

[37] *Id.*; *see also* Fed. R. Civ. P. 56 advisory comm. note to 2010 amendment.

[38] Because I only consider Hart's use-of-force report in my decision, I decline to determine whether the officers' additional evidence is admissible.

[39] ECF No. 167 at 48–50.

6

matter of law."[40]   On summary judgment, the court views all facts and draws all inferences in the

light most favorable to the nonmoving party.[41]   An inference need not be "necessarily the most

likely inference or the most persuasive," as long as it is "rational or reasonable."[42]   "Credibility

determinations, the weighing of the evidence, and the drawing of legitimate inferences from facts

are jury functions, not those of a judge."[43]   The purpose of summary judgment is to avoid

unnecessary trials when the facts are undisputed, so summary judgment is inappropriate when

reasonable minds could differ on material facts.[44]

**III.     Cepero's claims against the defendants in their official capacities are redundant.**

Cepero sues all of the individual defendants in their official capacities and some in their

individual capacities.[45]   He also sues LVMPD.[46]   The defendants argue that because Cepero also

sues LVMPD, the official-capacity claims against the individual defendants are duplicative of

the claims against LVMPD and should be dismissed on that basis.[47]   Cepero does not answer this

argument.

If the government receives adequate notice and is given an opportunity to respond, an

official-capacity suit against individual defendants is treated like a suit against the entity.[48]   And

---

[40] *See Celotex Corp. v. Catrett*, 477 U.S. 317, 330 (1986) (citing Fed. R. Civ. P. 56(c)).

[41] *Kaiser Cement Corp. v. Fishbach & Moore, Inc.*, 793 F.2d 1100, 1103 (9th Cir. 1986).

[42] *United Steelworkers of Am. v. Phelps Dodge Corp.*, 865 F.2d 1539, 1542 (9th Cir. 1989) (quoting *T.W. Elec. Serv. v. Pac. Elec. Contractors*, 809 F.2d 626, 631 (9th Cir. 1987)).

[43] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

[44] *Warren v. City of Carlsbad*, 58 F.3d 439, 441 (9th Cir. 1995).

[45] ECF No. 125 at 2–4 (amended complaint).

[46] *Id.* at 2.

[47] ECF No. 159 at 65.

[48] *Kentucky v. Graham*, 473 U.S. 159, 165–66 (1985).

dismissal is appropriate when the named-officer claim is redundant.[49]  Because Cepero named LVMPD in this action, the official-capacity claims against the officers are redundant, and I dismiss them on that basis.  Because Gillespie and Cassell were only named in their official capacities,[50] and Cepero's defamation claim against Cassell was dismissed in 2012,[51] the dismissal of the official-capacity claims against Gillespie and Cassell terminate these defendants from this case entirely.

**IV.    Cepero must show cause why his claims against Aiken and Fowler should not be dismissed under FRCP 4(m).**

The record reflects that Cepero has not served Aiken and Fowler.  In 2012, the first summons was returned as unexecuted as to Aiken and Fowler.[52]  After retaining pro bono counsel in 2018, Cepero tried to again serve Fowler and Aiken, and argued that they waived any defective-service argument because the defendants' attorney appeared on their behalf in this court.[53]  Judge Foley granted Cepero leave to serve process on Fowler and Aiken stating that if the defendants' attorney did not accept service on their behalf, Cepero was required to "promptly provide the necessary information to the United States Marshal so that he may serve these

---

[49] *Ctr. for Bio-Ethical Reform, Inc. v. Los Angeles Cnty. Sheriff Dep't.*, 533 F.3d 780, 799 (9th Cir. 2008); *see Mendiola-Martinez v. Arpaio*, 836 F.3d 1239, 1250 (9th Cir. 2016).

[50] ECF No. 125 at 2.

[51] ECF No. 28 at 7.

[52] ECF No. 40.

[53] ECF No. 111.

1  defendants."[54]  The defendants argue that Fowler and Aiken have yet to be served, so I should

2  grant summary judgment in their favor.

3        Under FRCP 4(m), when a defendant is not served within 90 days of filing the complaint,

4  the court "after notice to the plaintiff[,] must dismiss the action without prejudice against that

5  defendant or order that service be made within a specified time."[55]  Cepero does not dispute that

6  he never served these defendants.  Thus, I order Cepero to show cause why I should not dismiss

7  all claims against Fowler and Aiken for failure to serve them within the required 90 days.  If

8  Cepero fails to show cause to continue with this claim against Fowler and Aiken by October 30,

9  2020, his claims against Fowler and Aiken will be deemed abandoned and the case will proceed

10 only against Bonkavich on the excessive-force, assault, and battery claims.[56]

11

12 **V.    Cepero fails to raise a genuine issue of material fact about most defendants'
        involvement.**

13        I next consider the individual-capacity claims against the officer-defendants.  The

14 defendants contend that, of the officers named in the complaint, only Bonkavich is alleged to

15 have made relevant contact with Cepero, so all other individual defendants are entitled to

16 summary judgment in their favor.[57]  Cepero disagrees and maintains that all of the named

17 defendants are liable under § 1983 because they collectively planned his arrest and decided

18 which tactics to employ.[58]  Cepero also singles out defendant Marx and contends that it is

19

20 _____

   [54] ECF No. 122 at 9.

21 [55] Fed. R. Civ. P. 4(m).

22 [56] Because these two defendants have not been served, I do not analyze whether they are entitled
   to summary judgment at this stage.

23 [57] ECF No. 159 at 28–32.

   [58] ECF No. 167 at 52.

disputed whether Marx was present for the alleged incident, making the claims against him inappropriate for summary disposition.[59]

> **A.** **Defendants Chris Leveque, Dennis Flynn, Richard Hart, Greg Theobald, Travis Cord, Thomas Faller, Linda Ferron, Troy Radke, Rory Neslund, Craig Lilienthal, Steve Devore, Chris Neri, Scott Thomas, Robert Kegley, and Ernest Morgan are entitled to summary judgment because there is no evidence of their personal conduct that could give rise to liability.**

To avoid dismissal of his claims against each officer aside from Bonkavich, Cepero cites the Ninth Circuit's decision in *Harris v. Roderick*, which implies that supervisors who created dangerous special rules of engagement were collectively liable when officers following those rules caused injury.[60]  But the *Harris* decision is no help to Cepero here.  He has not identified evidence that any defendant other than Bonkavich and Marx was involved in the planning or actual entry of the apartment, or that the plan amounted to more than a hastily devised scheme to retrieve a fleeing arrestee.

But even if *Harris* could apply, Cepero has failed to show that each of the named defendants who did not enter the apartment planned the entry and that the plan included a direction to use excessive force.  Instead, Cepero asserts, without evidence, that "each of the individual officers personally contributed to the plan that ultimately led to a violation of [his] rights,"[61] while dismissing the officers' contradictory deposition testimony as self-serving.[62]

---

[59] *Id.* at 53.  Cepero also argues that Leveque and Flynn, as supervisors on the scene, are subject to liability for developing the plan and for permitting the officers to violate Cepero's constitutional rights.  *Id.*  For the same reasons that I find that Cepero failed to provide any evidence that this plan existed, he cannot state a claim against Leveque and Flynn under this theory.  As discussed below, he also cannot state a supervisory negligence claim against the two, so I dismiss them from the action.

[60] *Harris v. Roderick*, 126 F.3d 1189, 1204 (9th Cir. 1997).

[61] ECF No. 167 at 52.

[62] *Id.*

1   This is insufficient to create a genuine issue of material fact that any defendant was part of the

2   planning process, used excessive force, or even got close to Cepero.  The evidence, which

3   Cepero does not meaningfully dispute, shows that none of these defendants ever touched

4   Cepero—most were called for back-up and never even saw him.[63]  And although the officers'

5   testimony may perhaps be self-serving, "the district court may not disregard a piece of evidence

6   at the summary judgment stage solely based on its self-serving nature."[64]  Because Cepero has

7   not met his burden to establish a genuine issue of material fact to maintain any claim against

8   defendants Leveque, Flynn, Hart, Theobald, Cord, Faller, Ferron, Radke, Neslund, Lilienthal,

9

10   [63] *See* Ex. 7 at 47 ¶ 25, 48 ¶¶ 1–24 (Leveque deposition) (testifying that he was not inside of the apartment) Ex. II at 6 ¶¶ 18–23 (Flynn's answers to interrogatories) (stating he did not enter the apartment and the situation was already ongoing once he arrived);  Ex. Q at 89 (Hart's use of

11   force report) (stating he was outside of the complex and saw Cepero running away, attempted to tase him but was ineffective, and Cepero ran away); Ex. RR at 6 ¶¶ 15–22 (Theobald's answers to interrogatories) (stating he was not present when Cepero was arrested); Ex. EE at 2 ¶¶ 20–24

12   (Cord's answers to interrogatories) (stating he was not present when Cepero was arrested, was back-up and stationed outside on the perimeter, and only made contact with Cepero after he was in custody when he transported him to jail); Ex. GG at 2 ¶¶ 18–22 (Faller's answers to

13   interrogatories) (stating that the only time he saw Cepero was from 150 feet away); Ex. HH at 2 ¶¶ 20–23 (Ferron's answers to interrogatories) (stating that she never got close to Cepero, was merely back up, and attempted to chase him on foot, but never got close enough to see him); Ex.

14   QQ at 2 ¶¶ 20–22 (Radke's answers to interrogatories) (stating that he was not involved in the investigation and was only back up); Ex. PP at 2 ¶¶ 22–25 (Neslund's answers to interrogatories)

15   (stating that he was merely in his car looking at the apartments and Cepero was in custody by the time he got to the Naples apartment); Ex. MM at 2 ¶¶ 20–24 (Lilienthal's answers to

16   interrogatories) (stating he monitored the perimeter of both scenes and took Cepero to jail); Ex. FF at 2 ¶¶ 20–25 (Devore's answers to interrogatories) (stating that, because he was recovering

17   from back surgery, he drove to both apartments and briefly saw Cepero but never touched him); Ex. OO at 2 ¶¶ 20–22 (Neri's answers to interrogatories) (stating that he stayed on the perimeter

18   of both scenes); Ex. SS at 2 ¶¶ 21–27; 3 ¶¶ 1–2 (Thomas's answers to interrogatories) (stating that he was on the perimeter of both scenes as back-up, and did not get close to Cepero until he

19   waited outside of Cepero's hospital room); Ex. KK at 2 ¶¶ 20–25 (Kegley's answers to interrogatories) (stating he stayed on the perimeter of both scenes, and only saw Cepero being

20   taken into custody); Ex. NN at 2 ¶¶ 20–25 (Morgan's answers to interrogatories) (stating he was back up and attempted to chase Cepero on foot, but left because he was not wearing body

21   armor).

22   [64] *Nigro v. Sears, Roebuck and Co.*, 784 F.3d 494, 497 (9th Cir. 2016) (citing *S.E.C. v. Phan*, 500

23   F.3d 895, 909 (9th Cir. 2007)).

1  Devore, Neri, Thomas, Kegley, or Morgan, I grant summary judgment in their favor and

2  terminate them from this case.

3       **B.      Officer Marx is entitled to summary judgment.**

4       The absence of evidence against defendant Marx entitles him to summary judgment, too.

5  The parties do not dispute that Marx entered the Naples apartment; they dispute how long he

6  stayed there.  The defendants argue that Marx did not make contact with Cepero and left the

7  apartment to address his leaking mask long before the other officers reached the bathroom where

8  Cepero was hiding.[65]  To support this theory, the defendants cite Marx's sworn deposition

9  testimony.[66]  Cepero argues that "considerable evidence" shows that Marx entered the apartment

10  and took Cepero into custody.[67]  He cites a "SWAT warrant service planning sheet" and

11  Bonkavich's testimony that he "heard that officer Marx took [Cepero] into custody and walked

12  him out to detectives."[68]  But Cepero did not provide the service-planning sheet for the court's

13  review.  And Bonkavich's speculation is insufficient to overcome Marx's sworn testimony that

14  he was not involved in the arrest and never touched Cepero to create a genuine issue of material

15  fact.[69]  While Cepero avers that Marx's testimony is inconsistent with his interrogatory

16  responses,[70] this inconsistency does not create a genuinely disputed fact.  So, I grant summary

17  judgment in favor of Marx on Cepero's claims against him.

18

19

---

20  [65] ECF No. 159 at 31.

21  [66] Ex. Y at 25 ¶¶ 5–8.

    [67] ECF No. 167 at 54.

22  [68] *Id.* (citing Ex. X at 7 ¶¶ 8–12).

23  [69] Ex. Y at 84 ¶¶ 3–12, 85 ¶¶ 10–25, 86 ¶¶ 1–3.

    [70] *See id.* at 82 ¶¶ 8–24.

## VI.    Cepero's excessive-force claim against Bonkavich

With Cepero's claims against Gillespie, Cassell, Leveque, Flynn, Hart, Theobald, Cord, Faller, Ferron, Radke, Neslund, Lilienthal, Devore, Neri, Thomas, Kegley, Morgan, and Marx resolved, and an order to show cause why his claims against Aiken and Fowler should not be dismissed, I turn to Cepero's claims against Bonkavich, the officer at the center of this suit.  The grant of summary judgment in favor of defendants Cepero maintains that he was not injured before the officers knocked him out,[71] and once he regained consciousness, he was bleeding profusely and being carried out of the apartment.  The defendants dispute this theory and argue that the officers are entitled to qualified immunity on this claim or, alternatively, that Bonkavich's use of force was reasonable.  Construing the evidence in the light most favorable to Cepero, I cannot determine as a matter of law that Bonkavich is entitled to qualified immunity or that his force was reasonable.

### A.    Genuine factual disputes preclude a summary-judgment qualified immunity determination for Bonkavich.

Qualified immunity shields government officials from suit unless the plaintiff shows a violation of a statutory or constitutional right and "that the right was 'clearly established' at the time of the challenged conduct."[72]  While the court may evaluate these prongs in any order, it should avoid starting with the first prong "when it would unnecessarily wade into 'difficult

---

[71] Ex. Z at 124 ¶¶ 4–20, 138 ¶¶ 2–18.

[72] *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011).

1  questions' of constitutional interpretation that 'have no effect on the outcome of the case.'"[73]

2  Conduct is immunized if either prong is not satisfied.[74]

3       The Ninth Circuit has explained that "'whether a constitutional right was violated . . . is a

4  question of fact' for the jury, while 'whether the right was clearly established . . . is a question of

5  law' for the judge."[75]  To show that conduct violated a clearly established law, the plaintiff must

6  prove that, at the time of the alleged misconduct, "the contours of [the] right [were] sufficiently

7  clear that every reasonable official would have understood that what he is doing violates that

8  right."[76]  But "when there are disputed factual issues that are necessary to a qualified immunity

9  decision, these issues must first be determined by the jury before the court can rule on qualified

10  immunity."[77]

11       The parties' competing versions of events make it impossible for me to resolve whether

12  Bonkavich's conduct violated a clearly established law.[78]  Although Cepero's rendition is belied

13  by ample evidence and a jury may find it hard to believe, credibility decisions cannot be made on

14  summary judgment.[79]  The defendants contend that Bonkavich's testimony merely "fills in the

15

16

---

17  [73] *Sjurset v. Button*, 810 F.3d 609, 615 (9th Cir. 2015) (quoting *Pearson v. Callahan*, 555 U.S. 223, 236–37 (2009)).

18  [74] *Martinez v. City of Clovis*, 943 F.3d 1260, 1270 (9th Cir. 2019).

19  [75] *Morales v. Fry*, 873 F.3d 817, 823 (9th Cir. 2017) (alteration in original).

20  [76] *Ashcroft*, 563 U.S. at 741 (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)) (quotation and brackets omitted); *see Robinson v. York*, 556 F.3d 817, 826 (9th Cir. 2009).

21  [77] *S.R. Nehad v. Browder*, 929 F.3d 1125, 1140 (9th Cir. 2019) (quoting *Morales v. Fry*, 873 F.3d 817, 824 (9th Cir. 2017)).

22  [78] *Ting v. United States*, 927 F.2d 1504, 1510 (9th Cir. 1991) ("The issue of whether [the officer]
23  is entitled to qualified immunity also cannot be resolved as a matter of law in light of the factual conflict surrounding the circumstances of the shooting.").

[79] *Anderson*, 477 U.S. at 255.

gaps" in Cepero's story during the time he was unconscious.[80]  But that characterization is not accurate because their accounts are wholly inconsistent.

Bonkavich testified that Cepero's acts of resisting arrest forced Bonkavich to punch him. Under Bonkavich's account, Cepero was awake when the strike occurred.  But according to Cepero's testimony, as soon as an officer removed the dog, Cepero was hit by something and knocked unconscious.  When he awoke, he discovered he had been injured—injuries that he did not have before he was rendered unconscious—and was bleeding so badly from his face that officers poured water on him to clean him off.[81]  Thus, Cepero theorizes, the force sufficient to break his nose occurred while he was unconscious.

Because these narratives are at odds, I cannot conclude at this juncture that Bonkavich is entitled to qualified immunity on the excessive-force claim.  If Bonkavich's version is credited, it was likely not clearly established that hitting Cepero to gain compliance after he fled would violate his Fourth Amendment rights.  But if the jury believes Cepero, Bonkavich will not likely enjoy qualified immunity because the act of breaking an unconscious arrestee's nose may implicate a clearly-established right.  These irreconcilable versions of the story require a credibility determination that I cannot make on summary judgment.

The defendants also argue that Cepero cannot manufacture a genuine issue of fact with his testimony because he claims he was unconscious.  They rely on the Ninth Circuit's decision in *Lowry v. City of San Diego*[82] to support their argument.  But *Lowry* is factually inapposite.  In that dog-bite case, the plaintiff was bitten by a K9 officer while she was sleeping.  Three officers

---

[80] ECF No. 159 at 41.

[81] *See* Ex. Z at 27 ¶¶ 3–16 (detailing his injuries).

[82] *Lowry v. City of San Diego*, 858 F.3d 1248, 1255–56 (9th Cir. 2017).

offered consistent testimony about whether her door was open, how dark the room was, and whether the officers gave a verbal warning that the dog would be deployed.  Though the plaintiff theorized otherwise, the district court found—and the panel affirmed—that her testimony on those points could not create a genuine issue of fact because she could only speculate about those conditions that were occurring while she was unconscious.[83]

Here, Cepero is not merely speculating about what happened while he was unconscious. He had personal knowledge of his injuries before he claims he was knocked out, as well as the injuries he had when he woke up.  And it is that personal knowledge that creates the genuine issue of fact here, making this case more similar to *Santos v. Gates* and *Ting v. United States*.  In *Ting*, the plaintiff suffered from amnesia and could not remember being shot.[84]  The Ninth Circuit held that, because there was a dispute about why and how the officers shot the plaintiff, and a dispute about his injuries, summary judgment was inappropriate because a reasonable jury could find that the officers used excessive force.[85]  Similarly, in *Santos*, the Ninth Circuit held that a plaintiff who could not recall the actions that caused his injury but presented evidence that he was not injured before he encountered the officers, established a genuine dispute of material fact.[86]  Thus on summary judgment, I cannot disregard Cepero's testimony and theory of the case simply because he alleges that his injuries happened while he was unconscious.

**B.      Genuine issues of fact exist about whether the force was excessive.**

The parties' conflicting versions of events also leave genuine issues of fact about whether the force here was excessive.  Courts analyze claims that an officer used excessive force to arrest

---

[83] *Id.*

[84] *Ting*, 927 F.2d at 1508.

[85] *Id.* at 1510.

[86] *Santos v. Gates*, 287 F.3d 846, 851–52 (9th Cir. 2002).

16

a suspect under the Fourth Amendment.[87]  Whether force was excessive depends on "whether it was objectively reasonable 'in light of the facts and circumstances confronting [the officers], without regard to their underlying intent or motivation.'"[88]  To determine reasonableness, the "nature and quality of the intrusion on the individual's Fourth Amendment interests" must be balanced with "the countervailing governmental interests at stake."[89]  The Ninth Circuit has cautioned against granting summary judgment on excessive-force claims because "balancing nearly always requires a jury to sift through disputed factual contentions, and to draw inferences therefrom . . . ."[90]  While the Ninth Circuit has laid out factors to determine whether force was excessive, when "material questions exist regarding the circumstances of the [incident]" the court need not consider whether conduct is objectively reasonable.[91]

The same factual dispute that precludes summary judgment on qualified-immunity grounds also precludes me from determining on summary judgment the reasonableness of Bonkavich's actions.  Cepero has presented testimony from which a jury could reasonably infer that he was injured by Bonkavich while he was unconscious, which is at odds with defendants' position that Cepero was bleeding before they encountered him and he violently resisted Bonkavich's attempt to arrest him.  So I also deny the defendants' motion for summary judgment on the excessive-force claim against Bonkavich.

---

[87] *Graham v. Connor*, 490 U.S. 386, 394 (1989).

[88] *Gregory v. Cnty. of Maui*, 523 F.3d 1103, 1106 (9th Cir. 2008) (quoting *Graham*, 490 U.S. at 397).

[89] *Graham*, 490 U.S. at 396 (internal quotation marks omitted).

[90] *Drummond ex rel. Drummond v. City of Anaheim*, 343 F.3d 1052, 1056 (9th Cir. 2003); *Liston v. Cnty. of Riverside*, 120 F.3d 965, 976 n.10 (9th Cir. 1997).

[91] *See Ting*, 927 F.2d at 1510.

**VII.**   **Cepero fails to establish a genuine factual dispute on his § 1983 negligence claim.**

In his fourth claim for relief, Cepero seeks negligence remedies against the "defendant officers" under supervisory-liability and duty-to-intervene theories.[92]  Although he argues that this claim extends to all individual officers,[93] Judge Foley's order did not permit Cepero to assert negligence claims against all of the defendants.  In his order, Judge Foley noted that Cepero's first-revised complaint seemingly contains a claim for negligence against "specific individual defendants" and a *Monell* claim against LVMPD.[94]  And his order then granted leave to amend these claims to reflect this distinction, not to add a claim against each defendant for failing to intervene.[95]  But even if Cepero's reading of Judge Foley's order is correct and he could assert negligence claims against all defendants, both theories fail.

To state a claim for failure to intervene under § 1983, the plaintiff must prove that an officer failed to perform an act that he was legally required to do and that such failure is the cause of the plaintiff's injuries.[96]  An officer does not incur liability by merely being present at the scene.[97]  Because Cepero fails to identify any legal obligations requiring these officers'

---

[92] ECF No. 125 at 9–10.

[93] ECF No. 167 at 43–44.

[94] ECF No. 122 at 17.

[95] *Id.*

[96] *Ting*, 927 F.2d at 1511.

[97] *Veihmeyer v. City of Santa Ana*, 67 Fed. App'x. 470, 473 (9th Cir. 2003) (unpublished).

intervention, defendants are entitled to summary judgment on his negligence claim against the defendants under this theory.[98]

Cepero also fails to raise a genuine issue of fact for his supervisory-negligence claim. "There is no respondeat superior liability under section 1983," unless "the supervisor participated in or directed the violations, or knew of the violations and failed to act to prevent them."[99]  The defendants contend that summary judgment is appropriate because the supervisory officers, Leveque and Flynn, did not directly participate in the arrest.[100]  They add that, because neither of them knew of Bonkavich's conduct before it happened, they cannot be liable for failing to act.[101]  Cepero argues that the LVMPD supervisors knew that the officers' negligent training would likely result in his injury.[102]  But this argument supports only a state-law claim for negligent training, which Cepero has not alleged.[103]  Cepero does not provide evidence that suggests that Leveque and Flynn directed anyone to beat him or knew that Bonkavich would beat him, so they cannot be held liable under § 1983.  I thus grant the defendants' motion and enter summary judgment in their favor on Cepero's § 1983 negligence claims.

---

[98] Cepero does not and cannot allege a claim for failure to intervene against Bonkavich because Bonkavich could not intervene in his own conduct and would simply be liable under a different theory.  So this claim cannot proceed against him.

[99] *Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989) (citing *Ybarra v. Reno Thunderbird Mobile Home Vill.*, 723 F.2d 675, 680–81 (9th Cir. 1984)).

[100] ECF No. 159 at 53–54.

[101] *Id.* at 53.

[102] ECF No. 167 at 44.

[103] To the extent that Cepero alleges a negligent-training claim against LVMPD, LVMPD is entitled to discretionary-act immunity on that claim under NRS 41.032.  *See Paulos v. FCH1, LLC*, 456 P.3d 589, 595 (Nev. 2020).

**VIII.   Cepero lacks the facts to support *Monell* theory against LVMPD.**

In his fifth claim for relief, Cepero sues LVMPD.[104]  Generally, municipalities are not liable under § 1983 unless the "municipality *itself* causes the constitutional violation at issue."[105] In *Monell v. Department of Social Services*, the Supreme Court held that liability extends to a local government only when the constitutional violation was the result of its policy, practice, or custom, or a decision-making official directed or ratified the complained-of conduct.[106]  Thus, a plaintiff must show that the policy or lack thereof caused his injury to succeed on a *Monell* claim.[107]

A plaintiff may recover under *Monell* based on one of three theories[108]: (1) commission—when a municipality establishes an official policy or custom that causes the injury; (2) omission—when a municipality's oversight amounts to a deliberate indifference to a constitutional right[109]; or (3) ratification—when a policymaker authorizes or approves of the constitutional injury.[110]  Cepero does not identify the *Monell* theory undergirding his claim.  In his complaint, he seems to allege that LVMPD is liable under both commission and omission theories.[111]  But in his opposition to the summary-judgment motion, he appears to claim all three.[112]  Unfortunately, however, he satisfies none of them.

---

[104] ECF No. 125 at 10–11.

[105] *City of Canton v. Harris*, 489 U.S. 378, 385 (1989) (emphasis in original).

[106] *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690 (1978).

[107] *Bd. of Cnty. Comm'rs of Bryan Cnty., Okl. v. Brown*, 520 U.S. 397, 403–04 (1997).

[108] *Clouthier v. Cnty. of Contra Costa*, 591 F.3d 1232, 1249–50 (9th Cir. 2010), *overruled on other grounds by Castro v. Cnty. of Los Angeles*, 833 F.3d 1060, 1070 (9th Cir. 2016).

[109] *Id.* at 1249.

[110] *Id.* at 1250.

[111] ECF No. 125 at 10–11.

[112] ECF No. 167 at 41–43.

### A.    Commission

To establish a commission-based *Monell* claim, the plaintiff must show "the existence of a widespread practice that . . . is so permanent and well[-]settled as to constitute a 'custom or usage' with the force of law."[113]  Cepero does not identify any such policy, operative in 2009, requiring officers to use excessive force when executing arrest warrants or to beat an unconscious person who is not complying.[114]  And while Cepero claims that LVMPD's polices in 2009 lacked an appropriate definition of excessive force to instruct its officers, this does not establish it had a custom or policy for its officers to use excessive force.

Cepero also argues that LVMPD's official policies in 2009 resulted in a series of excessive-force cases that establish it had a custom of using excessive force.[115]  To support this argument Cepero relies on a petition that the ACLU filed against LVMPD about its use of force.[116]  Although the petition would likely be inadmissible at trial because it is hearsay and irrelevant to establish Cepero's claim,[117] the cases cited may be admissible for Cepero to prove an LVMPD custom or omission.[118]  The report cites by name 19 cases filed against LVMPD for

---

[113] *City of St. Louis v. Praprotnik*, 485 U.S. 112, 127 (1988) (quoting *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 167–68 (1970)).

[114] *See* Ex XX at 593 (LVMPD use of force policy) (charting when a party is fully compliant that an officer may only be present or use verbal communication).

[115] ECF No. 167 at 43.

[116] *Id.* at 41–43.

[117] Fed. R. Evid. 401.  Cepero also cites the DOJ report that followed this petition, asserts that the DOJ report shows that LVMPD was required to act after the report and that the policy required LVMPD to update its polices about use of weapons.  But he has failed to show how this evidence would be admissible at trial and does not allege that he was injured by use of a "baton, pepper spray, [or] tasers," so the contents of this report would likely be irrelevant under Rule 401.

[118] *See Trevino v. Gates*, 99 F.3d 911, 918–20 (9th Cir. 1996).  Although the report states that more than 200 cases involved excessive or deadly force, Cepero has not identified any cases beyond the 19 cited in the report.  While I must view all evidence in the light most favorable to

various alleged constitutional violations.[119]  But these cases range from unreasonable seizures to unlawful arrest.  And of the cases dealing with excessive force before 2009, only two appear deal with the type of force used during an arrest after the suspect has fled.[120]  Thus, while generally a policy or custom's existence is a jury question,[121] even viewing the evidence in the light most favorable to Cepero, he fails to establish that LVMPD had a "persistent and widespread practice such that it constitutes permanent and well[-]settled city policy."[122]  "When one must resort to inference, conjecture and speculation to explain events, the challenged practice is not of sufficient duration, frequency and consistency to constitute an actionable policy or custom."[123]  Thus, Cepero cannot state a *Monell* claim under a theory of commission.

### B.  Omission

Cepero also cannot establish a *Monell* claim under a theory of omission.  For an omission-based *Monell* claim for failure to train or supervise, a plaintiff must show, among other things, "that the municipality had a policy" that "'amounts to deliberate indifference' to [his] constitutional right."[124]  "Deliberate indifference is a stringent standard of fault, requiring proof

---

him on summary judgment, he has not identified that these cases present a factual scenario that would amount to a custom.  So I only analyze the 19 cases cited by name and description in the report.

[119] Ex. 15 at 8–11 (ACLU petition).

[120] *See Neal-Lomax v. Las Vegas Metro. Police Dep't*, 574 F. Supp. 2d 1170 (D. Nev. 2008); *Martinez v. Las Vegas Metro. Police Dep't*, 2:04-cv-00502.  Cepero does not dispute that he ran from officers and barricaded himself inside of the Naples apartment.

[121] *Trevino*, 99 F.3d at 920.

[122] *Id.* (internal quotation marks omitted).

[123] *Id.*

[124] *Oviatt v. Pearce*, 954 F.2d 1470, 1474 (9th Cir. 1992) (quoting *City of Canton*, 489 U.S at 389–91).

that a municipal actor disregarded a known or obvious consequence of his action."[125]  Plaintiffs can establish deliberate indifference by demonstrating that either "[a] pattern of similar constitutional violations by untrained employees" exists or "the unconstitutional consequences of failing to train" are "so patently obvious that a city could be liable . . . without proof of a pre-existing pattern of violations."[126]  The latter showing, called "single-incident liability," is "rare" and occurs only "in a narrow range of circumstances."[127]

Cepero again leverages the ACLU petition outlining the department's alleged practices, while arguing that "Sheriff Gillespie acknowledge [sic] the weak nature of the Use of Force Review Board and welcomed DOJ investigation of policies and procedures."[128]  But as I explained above, the sampling of cases that Cepero cites hardly establishes a pattern of constitutional violations amounting to deliberate indifference, even when viewed in the light most favorable to him.  And he offers no evidence to support a finding that this case is one of the rare circumstances in which the plaintiff need not establish a pattern of violations.  Thus, Cepero cannot establish his *Monell* claim based on an omission theory.

### C.   Ratification

Finally, Cepero cannot make out a *Monell* claim based on a ratification theory.  He asserts that "there has been ratification" because the supervisors failed "to investigate allegations of use of force."[129]  But the relevant question for ratification under *Monell* is not whether a supervisor investigated the injury-producing conduct but whether a policymaker approves the

---

[125] *Connick v. Thompson*, 563 U.S. 51, 61 (2011) (quotation omitted).

[126] *Id.* at 62–64 (quotation omitted).

[127] *Id.*

[128] ECF No. 167 at 43.

[129] *Id.*

1   unconstitutional decision.[130]  Cepero does not present evidence that LVMPD knew and approved

2   the use of excessive force, so he cannot state a *Monell* claim based on ratification.  LVMPD is

3   therefore entitled to summary judgment in its favor on Cepero's *Monell* claim.

4   **IX.    The facts fail to support an IIED claim.**

5          Cepero's fourth cause of action is for intentional infliction of emotional distress based on

6   defendants' act of ignoring the risk that he "would suffer extreme emotional distress" from their

7   actions.[131]  The defendants move for summary judgment on this claim because Cepero conceded

8   at his deposition that he would not pursue it and, alternatively, he cannot prove that he suffered

9   severe emotional distress from the incident.[132]  Cepero does not dispute this.

10          To prevail on a claim for IIED in Nevada, the plaintiff must prove, among other

11  elements, causation and severe or extreme emotional distress.[133]  This requires some "objectively

12  verifiable indicia of the severity of [the plaintiff's] emotional distress."[134]  Because Cepero has

13  failed to present evidence that creates a genuine issue of fact about whether he has suffered

14  severe or extreme emotional distress,[135] I grant summary judgment in favor of the defendants on

15  this claim.

16

17

---

18  [130] *Gravelet-Blondin v. Shelton*, 728 F.3d 1086, 1097 (9th Cir. 2013) (citing *Clouthier*, 591 F.3d at 1250).

19  [131] ECF No. 125 at 9.

20  [132] ECF No. 159 at 59 (citing Ex. Z at 195).

21  [133] *Miller v. Jones*, 970 P.2d 517, 577 (Nev. 1998) (citing *Posadas v. City of Reno*, 851 P.2d 438, 444 (Nev. 1993)).

    [134] *Id.*

22  [135] Ex. Z at 195 ("Q: So we just agreed off the record that at trial [Cepero wasn't] going to make

23  [Cepero's nightmares, panic attacks, and anxiety] a component of [his] injuries or [his] damages claims at trial, any mental disorder, is that fair?  A: Correct . . . [j]ust general pain and suffering that comes along with any injury.").

**X.    Cepero's assault and battery claims against Bonkavich**

    **A.    Discretionary immunity does not bar this claim.**

The defendants argue that discretionary immunity bars Cepero's state-law claim for assault and battery.  Cepero did not respond to this argument, but the failure to oppose the motion does not permit the court to enter summary judgment by default. [136]  So I consider the merits of this argument despite Cepero's silence about it.

NRS 41.032 immunizes state officers, agencies, and political subdivisions from actions "based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of the State or any of its agencies or political subdivisions . . . whether or not the discretion involved is abused." [137]  Nevada has adopted a two-part test to determine whether an act "fall[s] within the scope of [this] discretionary-act immunity." [138]  As described in *Martinez v. Maruszczak*, it must (1) "involve an element of individual judgment or choice;" and (2) "be based on considerations of social, economic, or political policy." [139] "[D]iscretionary decisions that fail to meet the second criterion of this test remain unprotected by NRS 41.032(2)'s discretionary-act immunity." [140]

The defendants cite *Gonzalez v. Las Vegas Metropolitan Police Department* for the proposition that whether to arrest or detain suspects is discretionary and thus immune from suit. [141]  But *Gonzalez* is distinguishable.  There, the Nevada Supreme Court categorized

[136] Fed. R. Civ. P. 56(e)(2), (3); *Heinemann v. Satterberg*, 731 F.3d 914, 917 (9th Cir. 2013).

[137] Nev. Rev. Stat. 41.032(2).

[138] *Paulos*, 456 P.3d at 595.

[139] *Martinez v. Maruszczak*, 168 P.3d 720, 729 (Nev. 2007).

[140] *Id.*

[141] ECF No. 159 at 62 (citing *Gonzalez v. Las Vegas Metro. Police Dep't.*, No. 61120, 2013 WL 7158415, at *3 (Nev. Nov. 21, 2013) (unpublished disposition)).  The defendants also argue that

1  LVMPD's decision to arrest or detain a suspect based on a warrant as policy decisions that were

2  susceptible to policy analysis for their political, social, and economic impact.[142]  Here, the

3  officers' decision was more akin to an "in-the-moment" decision regarding the necessary use of

4  force.  And even considering the defendants' facts undisputed on this issue, the defendants'

5  decisions are not of the type that Nevada intended to cover in its immunity scheme because they

6  are "unrelated to any plausible policy objectives."[143]  Thus, the decision about the appropriate

7  level of force to use inside of the apartment does not meet the second *Martinez* element and is

8  not protected by NRS 41.032.

9
10       **B.       Genuine disputes of material fact preclude summary judgment on Cepero's
                    battery claim.**

11       The parties agree that, under Nevada law, the question of whether force was reasonable

12  also determines whether an officer's battery is justified.[144]  Because I find that there are genuine

13

14

15

16

17

18  pre-*Martinez* Nevada cases held that seizures under the Fourth Amendment are included under
    NRS 41.032's protection.  ECF No. 159 at 62–63.  But the pre-*Martinez* calculus for whether
19  immunity applied did not consider the social, economic, or political policy of a decision to
    protect legislative and administrative policy decisions, so I decline to follow it here.  *See Paulos*,
20  456 P.3d at 596 n.3.

21  [142] *Gonzalez*, 2013 WL 7158415, at *3.

22  [143] *See Martinez*, 168 P.3d at 728 (quoting *Coulthurst v. United States*, 214 F.3d 106, 111 (2d
    Cir. 2000)); *see Estate of Brenes v. Las Vegas Metro. Police Dep't.*, No. 78272, 2020 WL
    4284335, at *1 (Nev. Jul. 24, 2020) (reversing summary judgment because officers were not
23  entitled to discretionary immunity for their use of force).

    [144] *See* ECF Nos. 159 at 58; 167 at 39.

issues of material fact to be resolved about what happened in this encounter, summary judgment on the battery claim is similarly inappropriate and I deny the defendants' motion on this claim.

**XI.    Punitive damages**

Finally, the defendants argue that I should strike Cepero's request for punitive damages because he cannot provide any evidence to suggest the officers acted with evil motive or intent, or that they acted with reckless or callous indifference to Cepero.[145]  Although Cepero does not counter this argument, again I find myself unable to make a summary-judgment determination because of the conflicting versions of events.  If Cepero's theory that Bonkavich beat an unconscious suspect is believed, punitive damages may be appropriate.[146]  So I deny the defendants' motion as to punitive damages.

**Conclusion**

IT IS THEREFORE ORDERED that **Defendants' motion for summary judgment [ECF No. 159] is GRANTED IN PART AND DENIED IN PART:**

- Summary judgment is granted against Cepero and in favor of defendants Gillespie, Cassell, Leveque, Flynn, Hart, Theobald, Cord, Faller, Ferron, Radke, Neslund, Lilienthal, Devore, Neri, Thomas, Kegley, Morgan, Marx, and the Las Vegas Metropolitan Police Department on any and all claims.  **The Clerk of Court is directed to TERMINATE Gillespie, Cassell, Leveque, Flynn, Hart, Theobald, Cord, Faller, Ferron, Radke, Neslund, Lilienthal, Devore, Neri, Thomas, Kegley, Morgan, Marx, and the Las Vegas Metropolitan Police Department as defendants in this action** as no claims remain against any of them.

---

[145] ECF No. 159 at 67.

[146] I do not make a determination about the availability of punitive damages here.

27

- Summary judgment is denied in all other respects, so **this case proceeds to trial on Cepero's excessive-force and assault-and-battery claims against defendant Bonkavich only.**[147]

IT IS FURTHER ORDERED that **Cepero must SHOW CAUSE by October 30, 2020, why his claims against defendants Aiken and Fowler should not be dismissed under FRCP 4(m).**

IT IS FURTHER ORDERED that **this case is REFERRED to the magistrate judge for a MANDATORY SETTLEMENT CONFERENCE between the remaining parties.**  The parties' obligation to file their joint pretrial order is STAYED until 10 days after that settlement conference.

_____
U.S. District Judge Jennifer A. Dorsey
October 21, 2020

---

[147] And potentially on his claims against Aiken and Fowler if he shows cause.

28